UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JEFFREY GEORGE MCKENZIE,

                Plaintiff,

v.                                                  Case No.  5:09-cv-228-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits. (Doc. 1.)  The Commissioner has answered (Doc. 4) and both parties have filed briefs outlining their respective positions.  (Docs. 12 & 13.)  For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

On August 17, 2004, Plaintiff filed an application for supplemental security income benefits and disability insurance benefits claiming a disability onset date of May 20, 2004.  (R. 13.)  Plaintiff's application was denied initially and upon reconsideration. (R. 322-27.)  Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 131-37.)  Plaintiff appeared and testified at a hearing held on April 20, 2006.  (R. 424-56.)

The ALJ issued a decision unfavorable to Plaintiff on July 12, 2006.  (R. 37-44.)

Plaintiff requested review by the Appeals Council of the ALJ's decision on September 9,

2006.  (R. 69.)  The Appeals Council remanded this case for consideration of additional

medical evidence on February 9, 2007.  (R. 72-74.)  A supplemental hearing before the

ALJ was conducted on July 24, 2007.  (R. 457-82.)  The ALJ issued a second decision

unfavorable to the Plaintiff on September 19, 2007.   (R. 20-30.)  Plaintiff requested

review by the Appeals Council of the ALJ's second decision on October 16, 2007.  (R.

16.)  The Appeals Council denied Plaintiff's request for review of the ALJ's second

decision on March 17, 2009.  (R. 7-11.)  Plaintiff then appealed to this Court.  (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

---

[1] See 42 U.S.C. § 405(g).

[2] See Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] See Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

taking into account evidence favorable as well as unfavorable to the decision.[4]

However, the district court will reverse the Commissioner's decision on plenary review if

the decision applies incorrect law, or if the decision fails to provide the district court with

sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment that can be

expected to result in death, or has lasted or can be expected to last for a continuous

period of not less than twelve months.[6]  The impairment must be severe, making

Plaintiff unable to do her previous work, or any other substantial gainful activity which

exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a

claimant is working at a substantial gainful activity, she is not disabled.[9]  Second, if a

claimant does not have any impairment or combination of impairments which

significantly limit her physical or mental ability to do basic work activities, then she does

---

[4] See Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] See Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] See 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] See 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] See 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] See 20 C.F.R. § 404.1520(b).

not have a severe impairment and is not disabled.[10]   Third, if a claimant's impairments

meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

disabled.[11]   Fourth, if a claimant's impairments do not prevent her from doing past

relevant work, she is not disabled.[12]   Fifth, if a claimant's impairments (considering her

RFC, age, education, and past work) prevent her from doing other work that exists in

the national economy, then she is disabled.[13]

   The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[14]   The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[15]   The Commissioner may satisfy this burden

by pointing to the grids for a conclusive determination that a claimant is disabled or not

disabled.[16]

   However, the ALJ should not exclusively rely on the grids when the claimant has

---

[10] See 20 C.F.R. § 404.1520(c).

[11] See 20 C.F.R. § 404.1520(d).

[12] See 20 C.F.R. § 404.1520(e).

[13] See 20 C.F.R. § 404.1520(f).

[14] See Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See Also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] See Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] See Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. SUMMARY OF THE RECORD EVIDENCE

### 1.    Evidence Considered by the ALJ

Plaintiff was forty-five years old when the ALJ entered his second decision.  (R. 29.)  Plaintiff has limited education, having successfully completed the ninth grade, and has past work experience as both a truck driver and a mover/driver.  (R. 28-29, 463.)

---

[17] See Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077   (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18] See Walker at 1003.

[19] See Wolfe at 1077-78.

[20] See id.

[21] See Doughty at 1278 n.2.

Plaintiff contends that, as of May 20, 2004, he was no longer able to work due to arthritis, a herniated disc and a hernia.  (R. 24, 40.)  Plaintiff was last insured for disability benefits on December 31, 2006.  (R. 103.)

Plaintiff sought treatment at Lapeer Regional Hospital on December 17, 2002 for lower back pain, a visit during which Plaintiff said that he had been suffering from such pain constantly and that he had experienced difficulty moving for the better part of ten years.  (R. 190.)  An MRI of the lumbar spine revealed multilevel disc disease with broad-based bulging, left paracentral at L5-S1, and small midline bulging L4-L5 as well as "moderate degree" arthritic facets.  (R. 191.)  Another MRI of the lumbar spine on December 9, 2003 revealed that Plaintiff's condition was essentially unchanged when compared to the MRI from the previous year. (R. 182-83.)

Plaintiff consulted Dr. Ratan Rajani on May 5, 2004 for pain in the left groin area, which Plaintiff noted had started the day before, on May 4, 2004.  (R. 160.)   Dr. Rajani discovered tenderness in that area and a small cough impulse was present.  (R. 160.) A CAT scan of Plaintiff's abdomen was normal and a subsequent visit to Dr. Rajani on May 12, 2004 occurred, with Plaintiff still reporting discomfort, but discomfort that was "definitely less" than Plaintiff had previously been experiencing.  (R. 160.)  Dr. Rajani discovered a small bulge in the left groin area on that visit and diagnosed a left inguinal hernia.  (R. 159.)  On May 21, 2004, Plaintiff underwent surgical repair of the left inguinal hernia, and as part of that process an excision of a lipoma of the cord was also performed.  (R. 167-76.)

After his left inguinal hernia repair, Plaintiff continued to see Dr. Rajani and on June 17, 2004 stated that on palpation he had severe pain but the doctor's progress

notes from that visit reveal that the physical findings did not confirm those symptoms. (R. 157.)  An ultrasound of the groin and testes on that day both came back normal and the doctor opined that Plaintiff was ambulating very well and that Plaintiff seemed to be moving quite well without any limping or bending when observed ambulating out of the office.  (R. 157.)   Dr. Rajani reported again on June 25, 2004 that Plaintiff appeared to be ambulating well and a nuclear medicine scan performed that day revealed increased flow to the left epididymis that was suggestive of acute epididymitis.  (R. 156.)  Plaintiff saw Dr. Jeffrey Greski for one visit in early July 2004, and Dr. Greski noted that Plaintiff reported having a tremendous amount of pain in the left groin and testicle area, pain that appeared to be radiating from the site of the hernia repair, and whose possible cause could be nerve entrapment or the formation of scar tissue.  (R. 161.)

In July 2004 Plaintiff saw Dr. Robert M. Stenz for complaints of left inguinal pain, and examination by Dr. Stenz showed some tenderness in the upper posterior portion of the left testicle and along the inguinal canal.  (R. 205.)  Follow-up visits to Dr. Stenz showed some tenderness in the left testicle upon physical examination and minimal tenderness in the inguinal area, although Plaintiff complained of severe pain to the left testicle and groin.  (R. 203.)  Later examinations continued to reflect some tenderness in the left testicle and minimal tenderness in the inguinal area, and led Dr. Stenz to rule out genitofemoral nerve entrapment as the cause of that tenderness and Plaintiff's pain in favor of a diagnosis of persistent orchitis.  (R. 201.)

Plaintiff consulted a urologist, Dr. D.V. Ramana, for a second opinion in August 2004. Dr. Ramana performed a physical examination and also examined Plaintiff's CT scan, MRI and ultrasound, but noted that his examination showed "no evidence of any

7

definite pathology." (R. 162.)  Dr. Ramana did note, however, that the area just below

the mid inguinal scar from the hernia operation seemed to be triggering the pain in

Plaintiff's scrotum and that the scrotal skin was very hypersensitive to the touch.  (R.

162.)  Dr. Ramana's recommendation was conservative treatment like nerve block

injections in the left groin region.  (R. 163.)  Dr. Stenz then proceeded to follow Dr.

Ramana's suggested course of treatment and performed a nerve block injection in the

left groin area on August 12, 2004.   (R. 198.)  Plaintiff was pain-free from that injection

for approximately five days and returned to Dr. Stenz on August 17, 2004 seeking

further pain relief.  (R. 198.)  Dr. Stenz recommended another nerve block injection in

the left groin area on that occasion, but Plaintiff refused the re-injection and exploration,

which led Dr. Stenz to note that Plaintiff "wants something done, but he is not allowing

us to do anything."  (R. 198.)

    Plaintiff was then referred by Dr. Stenz to a pain management specialist, Dr.

Young Seo, who noted that palpation of the left testicle did not cause pain and was not

tender but that Plaintiff did claim to feel pain there.  (R. 215.)  An EMG performed by Dr.

Seo on the left lower extremity showed a mild degree of L5 nerve root irritation and so

Plaintiff was given an L5 epidural nerve block, which significantly relieved the back,

groin, and testicular pain from which Plaintiff was suffering.  (R. 215.)   Follow-up visits

to Dr. Seo included further epidural block injections and reflected good pain relief for

several days at a time, and the doctor even reported on September 9, 2004 that the

Plaintiff was very happy.  (R. 208-10.)  Plaintiff also saw Dr. Stenz several more times

during this period with more complaints of the same left groin pain, and an MRI

revealed nothing while physical examination continued to reveal some tenderness of

the spermatic cord and left testicle.  (R. 196.)  Dr. Stenz's final visit with Plaintiff was on

September 9, 2004, during which he noted that his impression was that Plaintiff

suffered from chronic inguinal pain, possibly secondary to nerve entrapment, and

recommended that Plaintiff visit the University of Michigan pain clinic.  (R. 195.)

Plaintiff did not seek treatment for his left groin pain again until April 2006, when

he first visited Dr. Murali Angirekula with complaints of excruciating pain in the left groin

region that Plaintiff said he could no longer tolerate.  (R. 239.)  Dr. Angirekula's physical

examination on that date revealed that Plaintiff was in severe pain at rest and

particularly with movement with mobility quite restricted, but that his gait was normal

without any marked antalgic pattern.  (R. 240.)  Upon physical examination the doctor

reported that the range of motion of Plaintiff's spine was quite restricted in all directions

and Plaintiff's left groin had severe tenderness to palpation, particularly in the medial

aspect.  (R. 240.)  Dr. Angirekula's diagnosis was chronic low back pain in the right side

from degenerative disk disease and left groin pain from iliolinuingal neuropathy and a

transforaminal nerve root injection at the right L5-S1 level was performed.  (R. 240.)  Dr.

Angirekula advised Plaintiff to avoid bending and lifting heavy weights and strenuous

activities to prevent flare-ups of his pain and to ensure better response to treatment.

(R. 242.)

A follow-up visit on May 1, 2006 showed that Plaintiff's self-reported pain had

improved by 20 percent and Dr. Angirekula's physical examination on that date showed

that Plaintiff was comfortable at rest but that areas of his lower back still remained

tender to palpation.  (R. 235-36.)  Another transforaminal nerve block injection was

performed with the same restriction issued to ensure better response to the treatment.

(R. 235-36.)  Another visit to Dr. Angirekula on May 31, 2006 showed that the pain in Plaintiff's lower back was considerably improved but that Plaintiff still had considerable tenderness to palpation in the left groin and scrotal area.  (R. 231.)  Plaintiff's next visit on August 14, 2006 reflected lumbar spine mobility that was quite restricted and back pain that had been aggravated by Plaintiff's recent car trips back and forth between Michigan and Florida. Consequently, another transforaminal nerve block injection was performed and the same restriction as before was issued to ensure better response to treatment.  (R. 226.)

A further visit two months later to Dr. Angirekula on October 10, 2006 revealed tenderness to palpation that was fairly intense on the left groin and back, but that was much more stable than had previously been the case due to the nerve block injections. (R. 224.)  Plaintiff's subsequent visit on December 8, 2006 revealed that Plaintiff was enjoying good pain relief from the nerve block injections for months at a time, but that Plaintiff was also continuing to suffer from restricted mobility of the lumbar spine, and another nerve block injection was performed by Dr. Angirekula.  (R. 290.)  This injection provided Plaintiff with substantial relief of his lower back pain and Plaintiff reported being able to get around much better when he next saw Dr. Angirekula on February 6, 2007.  (R. 284.)  During that visit the doctor's physical examination showed that mobility of the Plaintiff's lumbar spine had improved while tenderness to palpation was still quite severe in the left groin.  (R. 284.)

During another visit to Dr. Angirekula in late March 2007 Plaintiff reported that the last nerve block injection had helped him considerably more than the others, this time for a little over three months.  (R. 280-81.)  The relief from Plaintiff's last injection

three months earlier in December had faded by this time, however, and another injection was performed due to Plaintiff's complaint that his left groin pain was getting quite intense.  (R. 280-81.)  Plaintiff's final visit to Dr. Angirekula on May 25, 2007 showed that Plaintiff's pain was quite stable, that he was seeing significant relief from the injections, while physical examination revealed that Plaintiff was comfortable at rest and with movement when he walked in and out of the examination room.  (R. 278.)

At roughly the same time that he was seeing Dr. Angirekula, Plaintiff was also being treated by Dr. Shyam Swain, an interventional pain specialist.  (R. 269.)  Dr. Swain noted in March 2007 that Plaintiff's left spermatic cord, left testicle and left inguinal area were all tender and diagnosed Plaintiff with genitofemoral neuritis, left spermatic cord pain, lumbar radiculitis and lumbar spondylosis.  (R. 262-76.)  Several left genitofemoral nerve block injections were performed by Dr. Swain during Plaintiff's visits to Dr. Swain in that month.  (R. 262-76.)  Follow-up visits occurred with the Plaintiff reporting that the pain control from the injections was inadequate, but Plaintiff's self-reported pain scores during this time actually dropped from an 8 out of 10 in early March 2007 to a 6 out of 10 the following month.  (R. 270, 307.)  In early May 2007 Plaintiff reported good pain control and improvement in sleep and daily activities to Dr. Swain, although he returned to Dr. Swain at the end of that month complaining of more pain and difficulty in daily activities.  Another left genitofemoral nerve block injection was performed at that time.  (R. 299-306.)  Plaintiff's self-reported pain score dropped to a 3-4 out of 10 in July 2007, although Dr. Swain noted at that point that Plaintiff had failed conservative treatment and physical examination showed increased tenderness in the left groin area and further restriction of range of motion in the lower back.  (R.

11

295-98.)

Plaintiff also consulted several other physicians during this period.  Plaintiff saw

Dr. Arif Zami, a neurologist, for a consultation in October 2006.  Dr. Zami diagnosed

Plaintiff with chronic left genitofemoral neuralgia, chronic left scrotal pain, chronic lower

back pain and degenerative disk disease from L3-L5.  (R. 294.)  Plaintiff also consulted

Dr. Robert Zerby, a chiropractor, in late February 2007 for an examination and disability

determination.  (R. 258-61.)  Dr. Zerby concluded that Plaintiff was disabled as a result

of status post multiple trauma in the cervical, thoracic and lumbar strain/sprain injury

associated with paravertebral myofascial pain syndrome complicated by bilateral

cervical brachial neuralgia and radiculopathy and left gluteal femoral and sciatic

neuralgia and radiculopathy.  (R. 258-61.)

### 2.   Evidence Submitted To The Appeals Council After Remand and the ALJ's Second Decision

Plaintiff submitted additional evidence to the Appeals Council after the ALJ

conducted the supplementary hearing and issued his second decision denying Plaintiff

disability benefits on September 19, 2007, evidence that was not considered by the ALJ

in making his determination as to Plaintiff's eligibility for disability benefits.  (R. 20-30.)

These medical records reflected additional visits to Dr. Swain between August and

September of 2007.  (R. 337-54.)  During those visits Plaintiff complained that his left

groin pain persisted despite the nerve block injections that he was receiving.  (R. 337-

54.)  Dr. Swain performed several more left genitofemoral nerve block injections and his

physical examinations revealed that Plaintiff's physical condition was essentially

unchanged.  (R. 337-54.)  Dr. Swain's conclusion as of his last visit with Plaintiff on

October 22, 2007 was that Plaintiff had failed conservative treatment, that his left groin pain affected his daily activities and work, and physical examination of Plaintiff showed increased tenderness in the left groin region and restriction of range of motion in the lower back area.  (R. 339.)

The additional evidence submitted by Plaintiff to the Appeals Council also consisted of records of very sporadic treatment of Plaintiff by Dr. Baha Essak between June 2006 and March 2008.  Dr. Essak diagnosed Plaintiff with left testicular neuropathy and performed several left testicular nerve block injections during that period.  (R. 331-35, 402-18.)  Dr. Essak also diagnosed Plaintiff with depression and prescribed Prozac to deal with this depression.  (R. 331, 333.)  Plaintiff's depression worsened considerably in early 2008, and Plaintiff visited the emergency room of a local hospital in April 2008 for acute anxiety.  (R. 413-18.)  The records from that emergency room visit reflect that Plaintiff was suffering from major depression.  (R. 399-400.)

## IV.  DISCUSSION

Plaintiff raises three arguments on appeal.  Plaintiff first argues that the ALJ's finding as to Plaintiff's Residual Functional Capacity ("RFC") improperly assumed Plaintiff's functioning without his need to take medications that had been prescribed by Plaintiff's doctors, that this finding incorrectly implied that Plaintiff did not require those medications and that it also incorrectly implied that Plaintiff was engaging in drug abuse or addiction.  Plaintiff's second argument on appeal is that the ALJ erred in failing to address the opinion of Dr. Murali Angirekula's, a treating physician, that Plaintiff should avoid bending due to his condition and that Plaintiff suffered from severe pain and significant limitation of motion.  Finally, Plaintiff argues that the ALJ erred in minimizing

Plaintiff's diagnosis of genitofemoral neuritis and its effect upon Plaintiff's ability to stand and walk for prolonged periods of time and to bend.  The Court will address each of these arguments in turn.

**A.     The ALJ's RFC Finding Did Not Improperly Assume Plaintiff's Functioning Without His Need To Take Medication and Did Not Incorrectly Imply That Plaintiff Does Not Require Medications Or is Engaging in Drug Abuse Or Addiction**

**1.     Drug Abuse/Addiction**

Plaintiff challenges the ALJ's finding as to his residual functional capacity, contending that the ALJ's RFC determination incorrectly implied that Plaintiff is engaging in drug abuse or addiction.  The Appeals Council remanded this case upon the basis of newly submitted evidence by Plaintiff after the original hearing decision of July 12, 2006 denying Plaintiff disability benefits.  In doing so the Appeals Council noted that such newly submitted evidence "indicates possible drug addiction/alcoholism involvement" and gave specific instructions to the ALJ to "if indicated, conduct the further proceedings required to determine whether drug addiction and alcoholism are contributing factors material to any finding of disability."  (R.  73-74.)  Plaintiff argues that the ALJ erred in never making a finding as to whether or not Plaintiff was abusing or addicted to prescription medications and that, in failing to do so, the ALJ did not properly follow the applicable regulatory framework.

Plaintiff's argument is predicated upon a misapplication of the analytical framework that is employed when drug or alcohol abuse/addiction is involved in a claimant's application for benefits.  According to Plaintiff, the threshold finding the ALJ

must make is whether there was drug/alcohol abuse or addiction.  The applicable regulations specify, however, that the threshold determination is actually whether or not the claimant is even disabled.[22]  Thus, under the applicable regulations, the ALJ first must determine whether the applicant is disabled before ever reaching the question of whether there was drug or alcohol abuse or addiction.[23]   The ALJ is only required to determine whether the claimant's drug or alcohol abuse was a material factor contributing to the claimant's disability *if and only if* the ALJ has first found the applicant disabled.[24]

In this case, the ALJ specifically considered whether or not the Plaintiff was disabled and concluded that he was not.  (R. 29, 43.)  Because the ALJ concluded that the Plaintiff was not disabled there was no need for the ALJ to determine whether Plaintiff was addicted to and/or abusing the medications prescribed to him by his doctor.  Accordingly, there was no error by the ALJ by failing to determine whether Plaintiff's prescription drug use constituted drug abuse or addiction that was a material factor contributing to a disability.

### 2. Plaintiff's Need to Take His Medications and His Functioning Without Them

Again focusing on the issue of the medications that he was taking, Plaintiff contends that the ALJ's RFC determination improperly assumed Plaintiff's functioning without his need to take prescribed medications.  Plaintiff also contends that the ALJ

---

[22] 20 CFR 404.1535.

[23] Id.

[24] Id.

further erred in determining that Plaintiff could perform the full range of light work because that determination incorrectly implies that Plaintiff does not require those medications.  Plaintiff specifically alleges that the ALJ "failed to make a finding as to what Mr. McKenzie's limitations were *with* the medications."

An ALJ has a duty to investigate the possible side effects of medications taken by a claimant and to consider those side effects of medications when evaluating a claimant's residual functional capacity.[25]  Consideration of side effects from medication is particularly appropriate where, as here, a claimant complains of side effects and the side effects are noted by the medical sources.[26]  It would therefore be error for the ALJ to make a determination as to Plaintiff's RFC without taking into account the side effects of the medications that Plaintiff takes.  The ALJ does not, however, need to inquire into whether it is necessary for the claimant to take the prescribed medications.

Plaintiff bases much of his argument on the ALJ's statement that Plaintiff "has the residual functional capacity to perform the full range of light work" and "the claimant could do light work especially if he were not dependent on prescribed medications."  (R. 23.)  While the ALJ's language is not a model of clarity the statement does fairly express the ALJ's finding that Plaintiff could perform the full range of light work while specifically taking into account the side effects of Plaintiff's prescribed medications.

The ALJ specifically considered the side effects of the medications that Plaintiff was taking and the limiting effect that such side effects had on Plaintiff's RFC. The ALJ

---

[25] *See* Lipscomb v. Comm'r of Soc. Sec., 199 Fed. Appx. 903, 906 (11th Cir. 2006)(unpublished), *citing* Cowart v. Schweiker, 662 F.2d 731, 737 (11th Cir. 1981).

[26] Cowart, 662 F.2d at 737.

concluded that those side effects were generally milder than reported by Plaintiff and that Plaintiff's medications were "relatively effective in controlling the claimant's symptoms." (R. 27.) For example, the ALJ referred to the progress notes of Dr. Swain, who noted that Plaintiff had self-reported that his medications were achieving good pain control and improving his ability to engage in daily activities and sleep at night. (R. 304.) The ALJ also referenced statements by the Plaintiff to Dr. Angirekula that he was "tolerating his medications well and without any significant side-effects." (R. 27, 41.) As evidenced by such statements, the ALJ specifically considered the side effects of the medications that the Plaintiff was taking and concluded that the Plaintiff was able to perform the full range of light work even though he was taking such medications, because those side effects were generally mild. Accordingly, the Court concludes that the ALJ did not err in finding that Plaintiff could perform the full range of light work, because this finding specifically took into account the limitations imposed upon Plaintiff by the medications that he was taking.

**B.    The ALJ Did Not Err in Failing to Address the Opinion of Dr. Angirekula**

Plaintiff contends that the ALJ erred in failing to address the opinion of Dr. Angirekula, a treating physician, that Plaintiff should avoid bending due to his condition and that Plaintiff suffered from severe pain and significant limitation of motion. Dr. Angirekula specifically advised the Plaintiff to avoid bending, heavy lifting and any strenuous activities after each nerve block injection that Plaintiff was given. (R. 236, 242, 281.)

It is well-established that substantial or considerable weight must be given to the

opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[27]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[28]   However, the ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[29]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[30]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; and (6)

---

[27] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[28] 20 C.F.R. § 404.1527(d)(2).

[29] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[30] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

18

other factors which tend to support or contradict the opinion.[31]   However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[32]

### 1.      Bending Restriction

Turning to Plaintiff's argument that the ALJ ignored the bending limitation issued by Dr. Angirekula, the record reveals that Dr. Angirekula did not issue a categorical, permanent ban on Plaintiff bending.  Dr. Angirekula instead gave a temporary bending restriction to Plaintiff only on those occasions when Plaintiff received a nerve block injection. The restriction was so that Plaintiff could enjoy the full benefit of the nerve block injections.  Moreover, between April 2006 and May 2007 on only four of nine visits Plaintiff received a nerve block injection and was given a bending restriction.  (R. 224-43, 278-93.)   For each visit the progress notes contain virtually identical language that Plaintiff  "was recommended to continue to avoid bending and lifting heavy weights and strenuous activities to prevent flare-ups of his pain and to ensure a better response to treatment." (R. 236, 242, 281.)  No bending restriction, however, was given by Dr. Angirekula to Plaintiff on those five visits during which nerve block injections were not administered.  (R. 224-43, 278-93.)  The progress notes reveal that the only restriction that was issued to Plaintiff by Dr. Angirekula during those visits when the injections were not received was to avoid strenuous activities.  (R. 278, 285.)

Thus, Dr. Angirekula's progress notes reflect that the doctor was merely advising

---

[31] 20 C.F.R. § 404.1527(d).

[32] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

Plaintiff to avoid bending to ensure that each nerve block injection achieved its maximum potential in reducing Plaintiff's pain instead of issuing a permanent limitation on bending.  Because this was a temporary restriction, Plaintiff was not under doctor's orders to avoid bending altogether and the ALJ did not need to include such a limitation in his RFC determination.  Accordingly,  the ALJ did not err in failing to include a bending limitation in his RFC determination that Plaintiff could perform the full range of light work.

### 2.    Severe Pain/Significant Limitation of Motion

Plaintiff also contends that the ALJ erred because he did not address Dr. Angirekula's opinion that Plaintiff was in severe pain and was hampered by significant limitation of motion.  Upon Plaintiff's initial visit to Dr. Angirekula on April 3, 2006, Plaintiff self-reported being in excruciating pain and told the doctor that he could not tolerate the pain anymore.  (R. 239.)  The doctor's initial examination notes reveal Dr. Angirekula's impression that Plaintiff was in severe pain at rest and even worse pain while moving.  (R. 239.)   Dr. Angirekula also noted at this time that Plaintiff walked slightly hunched over and his range of motion for his lumbar spine was quite restricted in every direction.  (R. 239.)

 Dr. Angirekula's progress notes over the course of the next fourteen (14) months of treatment, however, showed marked improvement in both the severity of Plaintiff's pain as well as his range of motion.  The doctor reported steady improvement in the severity of Plaintiff's pain as a result of the nerve block injections. (R. 224-43, 278-93.)  Plaintiff's visit on May 1, 2006 –  his first visit after the initial nerve block injection was given on April 3, 2006 –  showed an improvement of 20% in the pain that

Plaintiff self-reported.  (R.  235.)  A month later on May 31, 2006, the progress notes reflect that Plaintiff was feeling considerably better and Plaintiff also self-reported in early December of that same year that his most recent nerve block injection had "helped him far better than the others for [a] little over three months."  (R. 280.)   On February 6, 2007, the doctor noted that Plaintiff's mobility of the spine had improved and Plaintiff self-reported substantial relief of his pain and that he was able to get around better.   (R. 281, 84.)  The progress notes from Plaintiff's final visit to Dr. Angirekula on May 25, 2007 reflected that Plaintiff's pain was quite stable, that Plaintiff was seeing significant relief from the nerve block injections and that Plaintiff was tolerating his medications well.  (R.  278.)  The notes for that date also reflected Dr. Angirekula's assessment that Plaintiff was comfortable at rest as well as with movement when he walked in and out of the examination room.  (R.  278.)

Contrary to Plaintiff's suggestion, the ALJ specifically made a point of reviewing Doctor Angirekula's progress notes and specifically referenced the conclusions expressed by the doctor in those notes as support for his RFC conclusion that Plaintiff could engage in the full range of light work.  (R. 27.)  The ALJ specifically wrote that "Dr. Angirekula reported that the injections were helping the claimant for a few months at a time enabling him to cope with the pain a lot better" and that "[t]he doctor also advised the claimant to cut back on his medication on his better days" in support of his conclusion that medications and treatment had been relatively effective in controlling the claimant's symptoms.  (R.  27.)  As further support for his conclusion that the Plaintiff's complaints of pain were not credible, the ALJ also relied upon the statements from Dr. Angirekula's progress notes that Plaintiff seemed comfortable at rest and with

21

movement as well as walking in and out of the examination room. (R. 27.)

Accordingly, the ALJ did not, as Plaintiff contends, fail to give adequate weight to Dr. Angirekula's opinion but instead gave that treating opinion considerable weight in discounting Plaintiff's self-reporting of his pain and arriving at his RFC determination.

**C.    The ALJ Did Not Err in Failing to Specifically Assess Plaintiff's Genitofemoral Neuritis as a Separate Impairment or in Discrediting Plaintiff's Subjective Complaints of Severe Left Groin Pain**

Plaintiff alleges that the ALJ erred in minimizing Plaintiff's diagnosis of genitofemoral neuritis and its effect on Plaintiff's ability to stand and walk for prolonged periods of time and to bend.  In support of this conclusion Plaintiff argues that the ALJ "seemed to focus on" his lumbar spine conditions without giving consideration to his genitofemoral neuritis as a separate condition despite evidence in the record of that diagnosis.  Plaintiff also contends that the ALJ improperly discredited Plaintiff's reports of left groin pain despite evidence in the record to the contrary, such as prescriptions for narcotics and receipt of genitofemoral nerve block injections.

**1.    Independent Assessment of Genitofemoral Neuritis as a Separate Impairment**

Plaintiff contends that the ALJ erred by failing to address specifically his diagnosed condition of genitofemoral neuritis separately and independently from Plaintiff's other impairments in making his RFC determination.  Plaintiff's argument fails to take into account the nature of genitofemoral neuritis.

Neuritis is the inflammation of a nerve and the genitofemoral nerve is a nerve whose branches run throughout the area of the genitalia and thigh.[33]  Injuries to the

---

[33] Stedmans Medical Dictionary at 161,190, 271,630 (28th edition).

22

genitofemoral nerve, as pointed out by Defendant, often occur when the nerve or its branches are entrapped after lower abdominal surgeries.  In Plaintiff's case, he began complaining of left groin pain in 2004, which was diagnosed by Dr. Rajani as a left inguinal hernia, and surgery was performed by Dr. Rajani to repair the hernia.  (R. 40.) Soon after the surgery Plaintiff began complaining of pain in his left groin area, pain for which Plaintiff had received treatment, which included prescribed medications as well as repeated nerve block injections, from a variety of doctors since 2004.  (R. 25-27, 40-42.)  Plaintiff's left groin pain was, thus, directly related to the left inguinal hernia that he suffered from in 2004 and the surgery performed to repair that hernia.

Although the ALJ did not specifically address the effect of Plaintiff's genitofemoral neuritis separately and independently from Plaintiff''s other impairments in making his RFC determination, the ALJ did specifically address and discuss the inflammation of the genitofemoral nerve, the pain that it caused Plaintiff and, most importantly, the limitations that the pain caused Plaintiff under the umbrella analysis of Plaintiff's subjective complaints of pain.  The ALJ found Plaintiff had a severe combination of impairments, among which were several impairments that related to his left groin pain: left inguinal hernia, left testicular neuropathy, chronic groin pain worse since surgery but unremarkable magnetic resonance imaging (MRI) scan, nerve blocks and hernias.  (R. 22, 23, 39.)  The ALJ's decision contains a number of references to the problems Plaintiff experienced in his left groin area and the ALJ adequately discussed why he did not consider Plaintiff's combination of impairments to be severe. This discussion included Dr. Angirekelu's findings of a lack of tenderness to palpation in the right groin area.  (R. 28.)  The ALJ included Plaintiff's left groin pain in his

23

assessment as to the limitations imposed by Plaintiff's pain, even though he did not specifically use the words "genitofemoral neuritis."  The ALJ reviewed in exhaustive detail the pain that Plaintiff reported to his doctors in the left groin region, the findings of physical examinations in that area by those doctors, and the diagnoses rendered by each of those doctors, noting in at least one instance that Plaintiff's treating doctor had rendered a diagnosis of left genitofemoral neuritis.  (R. 25-26, 40-41.)  The ALJ also specifically referenced the treatment that Plaintiff was receiving for his left groin pain, suchas the nerve block injections and his prescribed medications,  as a part of the ALJ's pain analysis.  (R. 24-28, 40-42.)

In sum, the ALJ specifically considered the pain and inflammation in Plaintiff's left groin area that was a result of the 2004 surgery and the limitations that pain and inflammation caused Plaintiff, even though the ALJ did not specifically separate and analyze independently the Plaintiff's diagnosis of "genitofemoral neuritis." The left groin pain, inflammation in that area and the limitations imposed by this impairment were adequately addressed by the ALJ under the umbrella analysis of Plaintiff's subjective complaints of pain and this pain analysis was sufficient enough that a separate, independent discussion by the ALJ as to the severity of that impairment was unnecessary.  Accordingly, the Court concludes that the ALJ did not err because he did not separately consider that diagnosis.

### 2.    Plaintiff's Subjective Complaints of Left Groin Pain

Plaintiff also contends that the ALJ erred in discrediting his subjective complaints of left groin pain despite evidence in the record supporting those complaints.  This contention is without merit, as the ALJ's evaluation of Plaintiff's genitofemoral neuritis

24

and the pain caused by that impairment utilized the correct method and was based on substantial evidence.

In evaluating a disability, the ALJ must consider all of a claimant's impairments, including subjective symptoms such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[34]  If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[35]  While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[36] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[37]  However, a lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.[38]  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision,  "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific

---

[34] 20 C.F.R. § 404.1528.

[35] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[36] Foote at 1562-1563.

[37] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[38] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

credibility finding."[39]  As a matter of law, the failure to articulate the reasons for

discrediting subjective pain testimony requires that the testimony be accepted as true.[40]

In the instant case, the ALJ properly first determined that there was an

underlying medically determinable impairment that could be reasonably expected to

produce the claimant's left groin pain, the genitofemoral neuritis.  (R. 26-28.)  He then

proceeded to determine whether Plaintiff's statements about the intensity, duration and

functional limitations of his pain were substantiated by objective medical evidence and,

if not, whether Plaintiff's subjective complaints of pain were credible.  (R. 26-28.)  The

ALJ concluded that Plaintiff's medical impairments could reasonably be expected to

produce the alleged symptoms, but that the Plaintiff's statements concerning the

"intensity, persistence and limiting effects of these symptoms are not entirely credible."

(R. 26.)  The ALJ concluded that while "it is reasonable to conclude that claimant

should have some pain and/or limitations as a result of the effects of left groin and low-

back pains, the evidence as a whole does not substantiate any cause for such

debilitating pain, as described by the claimant, which would preclude all work activity."

(R. 27.)

In discounting Plaintiff's credibility, the ALJ noted that Plaintiff had activities of

daily living that were not consistent with his subjective complaints, that treatment for his

impairments has been essentially conservative and routine in nature and also

referenced the lack of significant findings by the treating examinations.  (R. 26-28.)

---

[39] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

[40] Id. at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

With regard to daily activities, the ALJ noted that Plaintiff's daily activities were not limited to the extent one would expect given the Plaintiff's subjective complaints of debilitating left groin pain. The ALJ noted that Plaintiff does chores around the house, does light laundry and cooking, takes care of a dog, grocery shops and goes to the flea market with his wife.  (R.  41.)  Notably, Plaintiff had also taken several long car rides from Florida to Michigan and back, which the ALJ considered to be another activity inconsistent with the debilitating type of left groin pain that Plaintiff complained of.  (R. 27.)

In further support of his credibility finding, the ALJ noted the lack of significant findings by the treating physicians in their physical examinations of Plaintiff.   (R. 27-28, 41-43.)   For instance, the ALJ noted that palpation of the left testicle by Dr. Young Seo did not cause pain and that the area was not tender during Dr. Seo's physical examination.  (R. 42, 215.)  The ALJ referred to the fact that Dr. Stenz sought to perform a re-injection and exploration procedure in the left groin area but that Plaintiff had refused to allow Dr. Stenz to do anything.  (R. 42.)  The ALJ also noted that as far back as 2004, when Plaintiff first saw Dr. Rajani regarding his left groin pain, that the doctor's physical findings did not confirm the Plaintiff's reported symptoms of severe pain. (R. 40, 157.)  As previously discussed, the ALJ also specifically discussed the successful treatment Plaintiff was receiving for his left groin pain, such as the marked improvement in Plaintiff's pain as a result of the left inguinal nerve block injections given by Dr. Angirekula.  (R. 278, 280-84.)

27

The ALJ performed the required analysis as to the intensity, persistence, and limiting effects of the alleged symptoms, concluding that Plaintiff's statements concerning those symptoms were not fully credible.  The ALJ articulated numerous specific reasons for finding Plaintiff's subjective complaints not entirely credible, all of which are supported by evidence in the record.   Accordingly, because the ALJ articulated specific reasons for finding Plaintiff's subjective complaints not entirely credible, and those reasons are supported by substantial record evidence, the Court concludes that the ALJ did not err in discrediting the Plaintiff's subjective complaints of left groin pain.

## V.  **CONCLUSION**

In view of the foregoing, the decision of the Commissioner is **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).  The Clerk is directed to enter final judgment in favor of the Defendant consistent with this Order and to close the file.

**IN CHAMBERS** in Ocala, Florida, on September 16, 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:

Counsel of Record